**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOHN GIORDANO**,<br><br>*Plaintiff*,<br><br>v.<br><br>**DEAN HEDEKER, et al.**,<br><br>*Defendants.* | **Case No. 2:24-cv-06430-JDW** |

**MEMORANDUM**

All too often, a disappointing life event leads to a lawsuit in an effort to find a target for that disappointment. John Giordano isn't happy with the results of his divorce proceeding, and the targets of his disappointment are the law firm and wealth managers who advised him and his ex-wife, as well as his wife's "very affluent family." (ECF No. 1 at 1.) But it's not enough for Mr. Giordano to feel that he received "far less" than he could have in his divorce proceedings, as he now claims. (ECF No. 44-8 at 297:21-23.) Instead, he needs evidence tying some defendant's conduct to concrete injuries that he suffered. As a result, most of his claims against the financial advisors fail. However, a single claim for fees paid to file a motion in the divorce proceeding can survive. Separately, his claims against the law firm defendants come too late, regardless of their merit. So, I will grant summary judgment on most of the claims in this case but permit one to proceed to trial.

# I. BACKGROUND

## A. Factual History

### 1. The Prenuptial Agreement

Dean Hedeker is an attorney and financial advisor who provides legal and wealth management services to the Moukarzel family, including Mr. Giordano's ex-wife Yasmina Moukarzel. He is the principal of both Hedeker Wealth, LLC and Hedeker Law, LTD. Before Ms. Moukarzel married Mr. Giordano, Mr. Hedeker prepared and negotiated a prenuptial agreement on her behalf. Mr. Giordano came to learn that Mr. Hedeker was the Moukarzel family's friend and long-standing investment advisor and attorney. Mr. Giordano, who is also an attorney, hired other lawyers to represent him during the negotiations over the prenuptial agreement, though he terminated their services before finalizing it.

On August 19, 2017, Mr. Giordano and Ms. Moukarzel entered into a Confidential Pre-Nuptial Agreement (the "Prenuptial Agreement"). The agreement made clear that both sides had the opportunity to obtain—and did obtain—"independent legal advice" and that each party "rel[ied] only on the legal advice given by his/her own counsel, and not on any such advice from counsel for the other party" when entering into the agreement. (ECF No. 44-17 at 2.)

Ms. Moukarzel and Mr. Giordano did not own any property together before the marriage. However, Ms. Moukarzel came into the marriage with significant investments and assets, including a condominium at 210 S. 25th Street, Unit 701 in Philadelphia,

Pennsylvania (the "Condo"). The Prenuptial Agreement provided that each party to the agreement would retain ownership of the property each owned when he or she entered the marriage as "separate property." Ms. Moukarzel listed the Condo and her other assets as separate property under the terms of the Prenuptial Agreement.

The Prenuptial Agreement provided that separate property would "not be transmuted nor shall it be changed into joint property absent a specific written agreement between the parties, entered only after the transferor of such property has obtained legal advice." (ECF No. 44-17 at ¶ 18.) The agreement also acknowledged the possibility that either party to it might use the other's separate property over the course of the marriage and explained that "no incidents of ownership, legal or equitable ownership, shall be inferred or conferred by the use, enjoyment or possession of the separate property of one party by the other." (*Id.* at ¶ 29.) Likewise, undertaking joint investments or engaging in business ventures together would not be sufficient to "transmute the separate property of either party to community property, to marital property or to property held by the parties as co-tenants, unless specifically designated or titled a joint property, pursuant to a written agreement[.]" (*Id.* at ¶ 22.)

Ms. Moukarzel and Mr. Giordano married on September 30, 2017. Over the course of marriage, Hedeker Law prepared their joint tax returns. And in January 2020, Hedeker Law also prepared a Trustee's Deed, by which Ms. Moukarzel conveyed an interest in the Condo to Mr. Giordano so that they held the Condo as tenants by the entireties. Mr.

Giordano never entered into an agreement for legal services with Mr. Hedeker or Hedeker Law. Nor did he ever pay them for legal services.

### 2. The Wrap Fee Agreement and financial investments[1]

On October 24, 2018, Mr. Giordano and Ms. Moukarzel entered into a Wrap Fee Investment Advisory Agreement (the "Wrap Fee Agreement") for Hedeker Wealth to serve as the couple's investment advisor. According to the agreement, both Mr. Giordano and Ms. Moukarzel acknowledged receipt of a disclosure statement that set forth the scope of Hedeker Wealth's services, fees, and any corresponding conflicts of interest. The agreement also acknowledged that a potential conflict of interest could arise between the couple. The Wrap Fee Agreement specified that Hedeker Wealth's services would "be based upon the [couple's] joint goals" and that Hedeker Wealth would "be permitted to rely upon instructions from either party with respect to the Assets, unless and until such reliance is revoked in writing …." (ECF No. 44-21 at ¶ 17.) Thus, absent a written revocation of authority, either Mr. Giordano or Ms. Moukarzel could direct Hedeker Wealth how to dispose of their assets and investments.

Throughout the course of the marriage, Ms. Moukarzel funded various investments. She put the money into a joint account with Mr. Giordano and believed that

[1] Mr. Giordano and Ms. Moukarzel invested in Kelson Asset Management, LLC, and Mr. Giordano contended that the Kelson funds were joint property. However, because Mr. Giordano does not allege that he suffered any damage in connection with the Kelson investment, I will not discuss it.

he would share in any profits after she recouped her initial capital. Mr. Giordano understood things differently and believed that the money in the joint account was for both of them, in addition to whatever profits may be realized. However, there is no dispute that Ms. Moukarzel and Mr. Giordano relayed Ms. Moukarzel's understanding to Mr. Hedeker when they met with him. As a result, Mr. Hedeker viewed these investments from Ms. Moukarzel to be similar to loans to the couple's joint account.

Over the course of the marriage, Ms. Moukarzel never directed Mr. Hedeker or anyone else at Hedeker Law or Hedeker Wealth to convert her separate property into joint marital property pursuant to the terms of the Prenuptial Agreement. And Mr. Hedeker always understood that any money that came from Ms. Moukarzel that was used for joint investments or transferred into the couple's joint account would remain her separate property. However, he assisted Mr. Giordano and Ms. Moukarzel with opening their joint account and setting up various joint investments.

Like Ms. Moukarzel, Mr. Giordano never directed Mr. Hedeker to convert any of Ms. Moukarzel's separate property into joint property pursuant to the terms of the Prenuptial Agreement. However, because Mr. Hedeker knew the terms of the agreement and because he was also responsible for opening joint accounts for them and making joint investments for them, Mr. Giordano assumed that Mr. Hedeker was taking whatever steps were necessary to make sure that those assets would be considered to be joint property under the Prenuptial Agreement. Mr. Hedeker never advised Mr. Giordano that

these joint accounts or investments would constitute joint property under the Prenuptial Agreement. However, Mr. Giordano contends that at various times, Mr. Hedeker told him that certain property was joint property.

**a. OGE Form**

During the marriage, Mr. Giordano was under consideration for a United States ambassadorship to Barbados. As part of the process, he had to prepare and submit Form 278E to the Office of Government Ethics ("OGE"), which is a financial disclosure meant to help screen for potential conflicts. Brian Sullivan at Hedeker Wealth provided Mr. Giordano with financial information to use in completing the OGE form.[2] Mr. Giordano submitted the form on December 9, 2019 and had to provide updated information as necessary. He contends that throughout this process, both Mr. Sullivan and Mr. Hedeker advised him what property to include on the OGE form, indicating that he jointly owned such property with Ms. Moukarzel.[3] Despite advising Mr. Giordano which property to list, Mr. Hedeker later took the position that the property at issue was separate property that belonged to Ms. Moukarzel alone.

[2] Mr. Sullivan is not an attorney, did not work for Hedeker Law, and never provided any legal advice to Mr. Giordano.

[3] The Parties have not addressed whether Mr. Giordano had to disclose only his own assets and his joint assets, or whether the Government required him to disclose his spouse's assets for conflicts purposes as well.

**b. EQUUS and Dillon**

On April 25, 2018, Ms. Moukarzel committed $5 million of her own money to invest in Equus Investment Partnership XI, L.P. ("EQUUS"). Months later, Ms. Moukarzel agreed to transfer the EQUUS investment from her living trust to her and Mr. Giordano, jointly. Mr. Giordano and Ms. Moukarzel also invested about $300,000 from their joint account into an investment called Dillon Inland Port I ("Dillon").

An EQUUS representative—not Mr. Hedeker, Hedeker Wealth, or Hedeker Law—sent Mr. Giordano and Ms. Moukarzel a transfer agreement and a new subscription agreement to sign, which they both did. Mr. Hedeker did not draft either agreement. In addition, Mr. Hedeker claims that he did not learn about the re-titling of this account into the couple's joint names until the divorce proceedings, and there is no evidence in the record to contradict that assertion. Ms. Moukarzel believed that distributions from the EQUUS investment would go into their joint account. However, Mr. Giordano believed that in addition to any profits, he was also entitled to the initial investment funds.

**c. GBTC**

Mr. Giordano and Ms. Moukarzel purchased shares of Grayscale Bitcoin Trust ETF ("GBTC"). Ms. Moukarzel used about $1.2 million of her funds to purchase GBTC and then distributed the shares into the couple's joint account. In the fall of 2021, Hedeker Wealth recommended that Ms. Moukarzel sell the GBTC shares. Ms. Moukarzel agreed and instructed Hedeker Wealth to divest the position. She claims she discussed this with Mr.

Giordano, but Mr. Giordano does not remember having this discussion. In any event, pursuant to Ms. Moukarzel's instructions, Hedeker Wealth sold some of the shares in September 2021 and then sold the remainder in May and June 2022.

#### d. Palantir

Mr. Giordano had contacts that could facilitate an investment in Palantir. In May 2020, Mr. Giordano spoke with Mr. Sullivan about the potential purchase of $500,000 worth of Palantir stock from a joint account. However, because Mr. Giordano would have had to disclose these investments to OGE while his ambassadorship was under consideration, he received legal advice to hold off on buying the stock. He told Mr. Sullivan not to proceed with the transaction at that time.

Though he did not proceed with the transaction from his joint account, Mr. Giordano also had discussions with Ms. Moukarzel's family about a potential investment in Palantir. Following those discussions, Mr. Giordano understood that Ms. Moukarzel's parents planned to make a $3 million investment in Palantir, and one-third of that would go to Mr. Giordano and Ms. Moukarzel. Mr. Giordano understood that LYM 5, LLC (a Moukarzel family entity) would purchase the stock, transfer 1/3 to Ms. Moukarzel's living trust account, and then Ms. Moukarzel would put the stock into a joint account for her and Mr. Giordano. Lea Moukarzel, Ms. Moukarzel's sister, controlled whether and when LYM 5 made distributions.

On February 19, 2021, Mr. Sullivan wrote to Mr. Giordano and advised him that "LYM 5 is receiving 418,242 shares of Palantir stock in a Computershare account. You and Yasmina will be receiving 125,472 of these shares." (ECF No. 44-36 at 2.) In May 2021, he also advised Mr. Giordano to include the Palantir shares (and the GBTC shares) on his updated OGE form. However, LYM 5 never distributed the shares to Ms. Moukarzel and Mr. Giordano. Neither Mr. Hedeker nor Hedeker Wealth could make the distributions on behalf of LYM 5. It is not clear from the record why LYM 5 did not make the distributions or whether Mr. Hedeker or anyone else at Hedeker Wealth knew that LYM 5 did not intend to make those distributions. Mr. Giordano contends that he relied on Mr. Sullivan's representations that he owned (or would own) Palantir shares and refrained from purchasing additional shares.

**3. The divorce**

In September 2021, Mr. Hedeker learned that Mr. Giordano and Ms. Moukarzel were separated or going to divorce, and Ms. Moukarzel directed Mr. Hedeker to preserve her funds and to keep her property separate. To that end, on October 28, 2021, Mr. Hedeker directed EQUUS to deposit all distributions into Ms. Moukarzel's living trust account rather than into a joint account. That is when Mr. Hedeker and Hedeker Wealth learned that Ms. Moukarzel had re-titled the EQUUS investment.

A month later, on November 29, 2021, Mr. Giordano's divorce attorney sent a letter to Hedeker Wealth revoking Mr. Giordano's consent for Hedeker Wealth to act on his

behalf without his knowledge or written consent. In the meantime, EQUUS failed to change where it was depositing distributions. Despite no longer having Mr. Giordano's consent to manage his investments, Mr. Hedeker nevertheless reached out to EQUUS again and directed them to make sure that they deposited any future distributions into Ms. Moukarzel's account only. Then, he sent the funds from the joint account back to EQUUS so that EQUUS could distribute them into Ms. Moukarzel's account. Mr. Giordano also contends that Mr. Hedeker instructed Dillon to re-direct distributions from the couple's joint account to Ms. Moukarzel's living trust account. Distributions were diverted in February and December 2022, after Mr. Giordano had revoked his consent.

Ms. Moukarzel filed for divorce on December 14, 2021. In January 2022, Mr. Hedeker wrote an email to employees of both Hedeker Wealth and Hedeker Law, advising them not to speak with Mr. Giordano and to direct him to Ms. Moukarzel's divorce attorney instead.

Part of the divorce proceedings involved arbitration, and on January 9, 2023, Mr. Hedeker testified at an arbitration hearing. Ms. Moukarzel's divorce attorney wanted Mr. Hedeker to provide testimony regarding the couple's finances and accounts. Neither Mr. Giordano nor his divorce attorneys objected to Mr. Hedeker testifying at the arbitration hearing, and they had the opportunity to cross-examine him, which they did. There is no transcript of Mr. Hedeker's testimony, but there is no dispute that Mr. Hedeker testified about the couple's holdings, including which of them were joint property and which were

separate. During this testimony, he took the position that the property he had told Mr. Giordano was joint property did not qualify as joint property pursuant to the terms of the Prenuptial Agreement. Mr. Hedeker claims that he testified about the sale of the GBTC shares during this hearing and how LYM 5 owned the Palantir shares, rather than Mr. Giordano and Ms. Moukarzel. However, Mr. Giordano contends he did not learn about either transaction until many months later. Neither an arbitrator nor the presiding Judge issued any findings of fact or conclusions of law based on Mr. Hedeker's testimony.

At some point during the divorce proceedings, Mr. Giordano learned that Mr. Hedeker had redirected the Dillon and EQUUS distributions into Ms. Moukarzel's personal account. On April 18, 2023, both sides stipulated that all the Dillon distributions that had gone into Ms. Moukarzel's personal account since January 2022 should be put into a joint account. They also agreed that any future distributions should go into the joint account. Similarly, in May 2023, Mr. Giordano's divorce attorneys filed a petition for special relief to force Ms. Moukarzel to put the diverted EQUUS funds back into a joint account. The Judge also approved a stipulation that Mr. Hedeker would provide a detailed accounting of the EQUUS distributions and that Ms. Moukarzel would preserve all the funds pending a final decision as to an equitable distribution.

However, neither the Judge nor an arbitrator ever rendered a decision as to an equitable distribution of marital property because the couple decided to settle their claims. On October 4, 2023, they attended a second arbitration hearing. At the end of the

hearing, the arbitrator made a settlement recommendation, and they entered into a settlement agreement that day.

As part of the settlement negotiations (and in the divorce proceedings themselves), Mr. Giordano argued that he was entitled to half of the couple's holdings, including the Condo, funds in their joint bank account, the Palantir shares, GBTC shares, and investments in EQUUS, Dillon, Kelson, and Cylon Capital LLC. He argued that his share of the couple's investments (including the Palantir and GBTC shares) was worth $3.4 million. Mr. Giordano contends that he first learned about the sale of the GBTC shares and the fact that he and Ms. Moukarzel did not own any Palantir shares on the last day of the settlement negotiations. He claims that he learned this after his attorney asked for these assets as part of the settlement discussions.

Despite receiving this information about GBTC and Palantir, Mr. Giordano continued with the settlement. However, he contends that Mr. Hedeker's, Hedeker Wealth's, and Hedeker Law's actions (and inactions) caused him to lose bargaining power in the divorce proceedings, and but for their conduct, he would have received more. Pursuant to the settlement agreement, Mr. Giordano received $2.5 million in cash and retained full ownership of an investment in Cylon Capital, valued at approximately $300,000 at the time. Ms. Moukarzel retained the Condo, and the EQUUS, Dillon, and Kelson investments.

### B. Procedural History

On December 2, 2024, Mr. Giordano filed suit against Mr. Hedeker, Hedeker Wealth, and Hedeker Law. In an Amended Complaint, Mr. Giordano asserts legal malpractice and breach of fiduciary duty claims against Mr. Hedeker and Hedeker Law (the "Hedeker Law Defendants") (Count One). He asserts breach of fiduciary duty claims and breach of contract against Mr. Hedeker and Hedeker Wealth (the "Hedeker Wealth Defendants") (Counts Two and Three, respectively). He alleges a fraud claim against Mr. Hedeker (Count Four). Following discovery, both sets of Defendants moved for summary judgment on all of Mr. Giordano's claims. In addition, they seek to exclude his experts from testifying. All the motions are ripe for disposition.

## II. SUMMARY JUDGMENT

### A. Legal Standard

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted).

In opposing summary judgment, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings" and "must do more than simply show

that there is some metaphysical doubt as to the material facts." *Id.* (quotation omitted). "[I]nstead, he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted). If he fails to make this showing, then the Court may "consider the fact undisputed for purposes of the motion" and/or "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(2), (3).

**B. Analysis**

**1. Count One**

**a. Scope of claims**

The first issue to resolve is the full scope of Mr. Giordano's claims against the Hedeker Law Defendants. In Count One of the Amended Complaint—which he styles as a claim for legal malpractice—Mr. Giordano alleges that Mr. Hedeker (1) "failed to execute a separate written agreement for the couple when they requested that the Condo be transformed into joint property" to benefit Ms. Moukarzel and (2) "caused [Mr. Giordano] to misrepresent his assets … on the OGE forms submitted in support of his candidacy for an ambassadorship." (ECF No. 19 at ¶¶ 71, 72.) Thus, the Hedeker Law Defendants moved for summary judgment on those two theories of liability.

Now, however, Mr. Giordano appears to be trying to expand his theory of liability against the Hedeker Law Defendants. He relies on an expert report from Clifford Cohn in

which Mr. Cohn opines that: (1) "Mr. Hedeker engaged in a serious conflict of interest and breached his fiduciary duty of loyalty to Mr. Giordano" when he testified on behalf of Ms. Moukarzel during the arbitration hearing (ECF No. 50 at 15); (2) Mr. Hedeker breached his fiduciary duty of loyalty and committed malpractice when he sold Mr. Giordano's jointly-owned investments and diverted jointly-owned proceeds to Ms. Moukarzel's personal account (*see id.* at 17-18); (3) Mr. Hedeker committed professional negligence and breached his fiduciary duty to Mr. Giordano when he "falsely advised [Mr. Giordano] $1,000,000 of Palantir stock already was his and jointly titled in his and Ms. Moukarzel's names when in fact it was not" (*id.* at 18); and (4) Mr. Hedeker breached his duty to Mr. Giordano when he failed "to revisit the Palantir stock issue and advise Mr. Giordano to buy as much of it as he could for himself and Ms. Moukarzel" once the ambassadorship fell through (*id.*).

None of these specific theories of liability appears in Mr. Giordano's Amended Complaint as a basis for his legal malpractice claims against the Hedeker Law Defendants. "[T]he principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). In Count One, Mr. Giordano alleges that Mr. Hedeker "breached his fiduciary duty … by actively choosing to place the interests of one client, Ms. Moukarzel, over the interests of another client, [Mr. Giordano]." (ECF No. 19 at ¶ 74.) That allegation is far too general to put the Hedeker Law Defendants on notice

of the specific theories of liability that Mr. Giordano appears to rely on now, which all relate to investment activity rather than legal services.

Mr. Giordano knew how to plead these specific theories of liability as part of his claims for relief but chose not to with respect to the Hedeker Law Defendants. For example, in Count Two of the Amended Complaint, he alleges that the Hedeker Wealth Defendants breached their fiduciary duties to him by "siphoning money out of the[] joint accounts, diverting investment income, and selling off stocks." (ECF No. 19 at ¶ 84.) The inclusion of this allegation as part of Count Two—and not Count One—reinforces my conclusion that Mr. Giordano did not assert these specific claims against the Hedeker Law Defendants in his operative pleading, so he cannot pursue them now.[4]

**b. Time-barred claims**

The statute of limitations bars the malpractice claims that Mr. Giordano did plead against the Hedeker Law Defendants. Mr. Giordano's malpractice claims are subject to a two-year statute of limitations under Pennsylvania law. *See* 42 Pa. C.S.A. § 5524(7). Given "Pennsylvania courts' policy favoring the strict application of statutes of limitation[,]" Pennsylvania uses the occurrence rule to determine when the statute of limitations begins to run in legal malpractice cases. *Glenbrook Leasing Co. v. Beausang*, 839 A.2d 437, 441

[4] Though my Policies And Procedures permit Parties to file sur-replies, Mr. Giordano didn't file one. As a result, he did not dispute the Hedeker Law Defendants' assertion that he failed to include a legal malpractice claim or breach of fiduciary duty claim based on Mr. Hedeker testifying at the divorce arbitration hearing.

(Pa. Super. Ct. 2003), *aff'd*, 881 A.2d 1266 (Pa. 2005) (citation omitted). "Under this rule, 'the statutory period commences upon the happening of the alleged breach of duty.'" *Id.* (quotation omitted). However, the discovery rule operates as an exception to the general rule and tolls the statute "when the injured party is unable, despite the exercise of due diligence, to know of the injury or its cause. Lack of knowledge, mistake or misunderstanding, will not toll the running of the statute." *Id.* (same). "[T]he determination of when the statute of limitations has run on a claim for legal malpractice is usually a question of law for the trial judge, unless the issue involves a factual determination." *O'Kelly v. Dawson*, 62 A.3d 414, 419 (Pa. Super. Ct. 2013) (quotation omitted).

Mr. Giordano's claim based on the Hedeker Law Defendants' alleged completion of the OGE form is untimely. He contends that the form contained misrepresentations about his assets when he submitted it to the OGE on December 9, 2019. Thus, the occurrence rule required Mr. Giordano to assert any malpractice or breach of fiduciary duty claim based on this conduct by December 9, 2021. He does not mount any argument to the contrary. Because Mr. Giordano did not assert this claim until December 2024, it is time-barred.

Mr. Giordano's claim based on the Hedeker Law Defendants' alleged failure to convert the Condo to joint property is also too late. Even if Mr. Giordano claims that Mr. Hedeker and his firm failed to perfect the conversion of the Condo to joint property when they added his name to the deed in January 2020, he could have discovered that alleged

injury at least as of December 2, 2021, when Ms. Moukarzel's divorce attorney exchanged correspondence with Mr. Giordano's attorneys, explaining that Ms. Moukarzel took the position that "[n]one of the jointly titled assets"—including the Condo—met the standard for transmutation of separate property under the Prenuptial Agreement because Mr. Giordano and Ms. Moukarzel had not executed a simultaneous written agreement. (ECF No. 44-18 at ¶ 3.) Counsel's letter also made clear Ms. Moukarzel's view that the Condo was "a pre-marital asset" that was "covered pursuant to the terms of the pre-nup within the definition of separate property." (*Id.* at ¶ 5.) Mr. Giordano admitted that at that point, he understood that Ms. Moukarzel was taking the position that the Condo was not considered joint marital property due to an alleged failure to comply with the terms of the Prenuptial Agreement. (*See* ECF No. 44-9 at 451:1-15.)

Thus, at a minimum, Mr. Giordano—who was represented by counsel and is an attorney himself—could have discovered the alleged breach by Mr. Hedeker and his firm by exercising reasonable diligence and looking into the issue. He therefore needed to bring any malpractice claim no later than December 2, 2023. Because he waited until December 2024, the statute of limitations bars that claim. The Hedeker Law Defendants are entitled to summary judgment on Count One of the Amended Complaint.[5]

---

[5] Given this ruling, the Hedeker Law Defendants' Motion To Preclude Clifford B. Cohn From Offering His Expert Opinion (ECF No. 57) is moot.

### 2. Counts Two, Three, and Four

#### a. Speculative damages claims

Like his claims against the Hedeker Law Defendants, Mr. Giordano has offered shifting and varied versions of his claims against the Hedeker Wealth Defendants (and his fraud claim against Mr. Hedeker). However, it does not matter which theory Mr. Giordano intends to rely on at trial because these claims all fail for the same reason—Mr. Giordano's alleged injuries and any resulting damages are too speculative.

In Counts Two and Three of the Amended Complaint, Mr. Giordano asserts claims against the Hedeker Wealth Defendants for breach of fiduciary duty and breach of contract, respectively. In Count Four, he contends that Mr. Hedeker is liable for fraud. Though distinct, each of these claims requires Mr. Giordano to prove that the Hedeker Wealth Defendants injured him and caused damages,[6] but he cannot do so based on the record before me.

---

[6] To prevail on his breach of fiduciary duty claims, Mr. Giordano must prove: (1) the existence of a fiduciary relationship between him and the Hedeker Wealth Defendants; (2) the Hedeker Wealth Defendants negligently or intentionally failed to act in good faith and solely for Mr. Giordano's benefit; and (3) Mr. Giordano suffered an injury as a result of the breach. *See Marion v. Bryn Mawr Tr. Co.*, 288 A.3d 76, 88 (Pa. 2023) (quotation omitted). To prove a breach of contract claim, he must show: "(1) the existence of a contract, including its essential terms[;] (2) a breach of the contract; and (3) resultant damages." *Doe v. Univ. of Scis.*, 961 F.3d 203, 211 (3d Cir. 2020) (same). And finally, to hold Mr. Hedeker liable for fraud, Mr. Giordano must prove: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Marion*, 288 A.3d at 87 (quotation omitted).

Pennsylvania law "does not permit a damages award to be based on mere guesswork or speculation." *Vinculum, Inc. v. Goli Techs., LLC*, 310 A.3d 231, 254 (Pa. 2024) (quotation omitted). "However, the '[t]he test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages. … Thus, damages are speculative only if the uncertainty concerns the fact of damages rather than the amount." *Wachovia Bank, N.A. v. Ferretti*, 935 A.2d 565, 572 (Pa. Super. Ct. 2007) (quotation omitted). That said, there must be "a reasonable basis" to support a damages award. *Helpin v. Trs. of Univ. of Pennsylvania*, 10 A.3d 267, 270 (Pa. 2010). Aside from one limited instance, the fact of Mr. Giordano's alleged damages is too speculative for his claims to survive summary judgment.

Mr. Giordano contends that the Hedeker Wealth Defendants breached fiduciary duties owed to him and breached the Wrap Fee Agreement and that Mr. Hedeker engaged in fraud in various ways, including:

- Directing EQUUS and Dillon to deposit future distributions into Ms. Moukarzel's personal account rather than into a joint account without Mr. Giordano's authorization;
- Selling GBTC shares without Mr. Giordano's authorization;
- Failing to convert the Condo into marital property pursuant to the Prenuptial Agreement;
- Telling Mr. Giordano that he jointly owned, or would jointly own, shares of Palantir;

- Advising Mr. Giordano that other assets were jointly owned and to list them as such on his OGE form;

- Testifying at the divorce arbitration hearing that certain property was not joint property under the Prenuptial Agreement, despite having told Mr. Giordano that such property was his on prior occasions;[7] and

- Failing to disclose conflicts of interest in working for Mr. Giordano, Ms. Moukarzel, and her family as both an attorney and a wealth advisor.

Mr. Giordano contends that these acts and omissions put him at a disadvantage during his divorce proceedings and impeded his ability to strike a better deal with Ms. Moukarzel, causing him economic harm. However, his claims fail because he has no evidence that he suffered damages. Instead, he relies on his own beliefs and say-so.

According to Mr. Giordano, "[t]he relevant inquiry is whether Defendants' conduct altered [his] control over assets, impaired his bargaining position, or affected the allocation of property during equitable distribution." (ECF No. 48 at 12.) The problem, however, is that Mr. Giordano has not come forward with evidence to prove that (1) those things occurred or (2) if they did, how they caused him damages. All of his deposition testimony on this issue is conclusory and unsupported. For example:

Counsel: What's the harm to you as a result of [Mr. Hedeker's] alleged actions?

***

Giordano: Losing leverage.

Counsel: Which you can't quantify?

[7] As set forth above, this specific theory of liability does not appear in the Amended Complaint. Thus, even if viable, Mr. Giordano could not pursue it.

Giordano: Well, I can quantify it.

Counsel: How?

Giordano: The fact that at the end of the day, I took far less than I would have been able to walk away with. If this, in fact, was in my account — again, **I believe** in retrospect, I was in a worse position than I believe. I don't believe the court realized how bad of a position I was in in allowing him to hold the funds.

(ECF No. 44-8 at 297:8 – 298:3 (emphasis added).)

Mr. Giordano does not have evidence that the Hedeker Wealth Defendants caused him any economic harm while they held or managed his joint property, even if they were not always acting in his best interest. Instead, he infers that because Mr. Hedeker was acting "behind [his] back," he had been in "worse position than [he] realized" because Mr. Hedeker "couldn't be trusted." (*Id.* at 294:13, 299:19-21.) But feelings of betrayal—even if reasonable—aren't damages that Mr. Giordano can recover in this lawsuit. And even if the Hedeker Wealth Defendants breached their fiduciary duty to Mr. Giordano by arranging for distributions to go into Ms. Moukarzel's personal account rather than a joint account, the divorce court rectified that harm by ordering Ms. Moukarzel to transfer those funds into the joint account. There is no dispute that is what happened, and Mr. Giordano and Ms. Moukarzel accounted for those funds when negotiating their divorce settlement.

Though he didn't trust Mr. Hedeker[8], Mr. Giordano has no evidence that Mr. Hedeker moved other funds against his wishes or failed to comply with the divorce court's order.[9] Relatedly, he does not have evidence that he suffered damages as a result of the Hedeker Wealth Defendants' failure to disclosure the alleged conflict of interest arising from Mr. Hedeker working for Mr. Giordano, Ms. Moukarzel, and her family as both an attorney and a wealth advisor. Neither Mr. Giordano nor his expert explained what would have been different had the Hedeker Wealth Defendants disclosed the conflict. (*See* ECF No. 44-3 at ¶¶ 182-183.)

Mr. Giordano also does not have evidence that the Hedeker Wealth Defendants caused him any damage by selling joint assets and failing to convert other assets into joint property. He acknowledges that he could have argued—and did argue—for the value of these assets during the divorce proceedings. (*See* ECF No. 44-8 at 315:22-24.) In addition, to the extent Mr. Giordano contends that he "would have been able to walk away with" more—either in terms of cash or the assets themselves—he has not come forward with any evidence to prove that. (*Id.* at 297:22-23.) Mr. Giordano claims that Mr. Hedeker's actions "caused him **to believe** settling with his ex-wife and pursuing action

---

8 Despite not trusting Mr. Hedeker, Mr. Giordano stipulated with Ms. Moukarzel that Mr. Hedeker would continue managing their joint account during the divorce proceedings. (*See* ECF No. 44-33 at ¶ 2.)

9 On the contrary, Mr. Giordano testified that he believed that Mr. Hedeker abided by the divorce court's directive to deposit any future distributions into a joint account. (*See* ECF No. 44-8 at 300:5-8.)

against Hedeker was the only available course of action[,]" but, of course, Mr. Giordano's personal beliefs are not evidence. (ECF No. 44-3 at ¶ 59 (emphasis added).) And neither Mr. Giordano, nor his expert, Jon-Eric Kronvall, provided any evidence as to how the arbitrator or the presiding Judge would have divided the assets differently during the divorce proceeding if any assets were considered joint property. Mr. Giordano testified that he would have received "[**p]otentially** half" of the assets (ECF No. 44-8 at 316:16 (emphasis added)), but—again—this is nothing more than his own speculation.[10] He also has no evidence that the arbitrator or the Judge would have awarded him specific assets (let alone which ones), as opposed to a monetary judgment.

Likewise, Mr. Giordano has no evidence that had these assets been joint property, Ms. Moukarzel would have offered him more to settle their divorce. This sort of theory is too speculative to support a claim for damages. Indeed, Pennsylvania's Superior Court rejected similar claims in a malpractice action in which the plaintiff argued that her attorney committed malpractice by providing her inaccurate information about the value of her husband's stock holdings. She claimed that with that knowledge, she "would have been in a better bargaining position [and] may have been able to achieve a better settlement." *Mariscotti v. Tinari*, 485 A.2d 56, 58 (Pa. Super. Ct. 1984). The Superior Court

---

10 Mr. Kronvall also calculated Mr. Giordano's alleged damages based on an assumption that he would have received half of their value but for the Hedeker Wealth Defendants' alleged conduct. But like Mr. Giordano, Mr. Kronvall has no evidence to support that assumption.

dismissed her claim as "pure speculation. Whether she could have obtained a better settlement is anyone's guess. How much better, of course, is even more speculative." *Id.* As a result, the Superior Court held that those "issues cannot properly be left to the surmise of a jury." *Id.*

Mr. Giordano is in a similar position. When asked to identify what harm he suffered because of the Hedeker Wealth Defendants' alleged actions or inactions, Mr. Giordano could only explain that he "believe[s]" that he could have gotten a better settlement because Mr. Hedeker "put [him] in a position where [he] ended up having to take less in [his] settlement than [he] would have, had it been an equitable distribution." (ECF No. 44-8 at 69:3-17.) Both of Mr. Giordano's personal beliefs—that his only option was to settle with Ms. Moukarzel and that he would have received a better settlement but for the Hedeker Wealth Defendants' conduct—are not evidence of damages. Absent such evidence, Mr. Giordano's alleged damages are too speculative to sustain nearly all his claims.

**b. Non-speculative damages claims**

In their Statement Of Undisputed Material Facts, the Hedeker Wealth Defendants concede that Mr. Giordano identified at least one source of non-speculative damages—"the cost of filing a motion in divorce court" to recover the EQUUS and Dillon distributions that Hedeker Wealth had redirected to Ms. Moukarzel's personal account. (ECF No. 44-3 at ¶ 123; *see also* ECF No. 44-8 at 297:8-15.) Indeed, Mr. Giordano incurred

costs when he learned about the redistributions during the divorce proceedings, and his attorneys filed a motion and a stipulation asking to have the funds put back into a joint account. Assuming those costs are recoverable as damages in this action,[11] those damages are not speculative. Thus, the question is whether Mr. Giordano has enough evidence to sustain his claims based on this conduct.

**i. Breach of fiduciary**

Though the Hedeker Law Defendants raised this argument for the first time in reply, the gist of the action doctrine bars Mr. Giordano's breach of fiduciary duty claims based on the diversion of EQUUS and Dillon distributions. In general, litigants should not raise substantive arguments for the first time in a reply brief. Accordingly, my Policies And Procedures make clear that replies should be used to "address only new issues raised by opposing counsel."[12] When a party raises a new argument for summary judgment in a reply brief, like the Hedeker Wealth Defendants did, "[c]ourts ordinarily either decline to consider [such] arguments ... or afford the non-movant the opportunity to file a sur-reply brief before granting summary judgment on a newly raised basis." *Lins v. Pennsylvania Soc'y for Prevention of Cruelty to Animals*, No. 21-cv-3975, 2023 WL 4166087, *2 n.6 (E.D. Pa. June 23, 2023), *aff'd*, No. 23-2325, 2024 WL 3508156 (3d Cir.

---

11 The Hedeker Wealth Defendants have not argued to the contrary in their summary judgment motion.

12 Judge Wolson, Policies And Procedures, Section II.B.2, *available at* https://www.paed.uscourts.gov/judges-info/district-court-judges/joshua-d-wolson.

July 23, 2024) (quotation omitted). In this instance, my Policies And Procedures permitted Mr. Giordano to file a sur-reply to address the Hedeker Law Defendants' gist of the action argument, so I am free to consider it (even if Mr. Giordano elected not to file a sur-reply).

In Pennsylvania, "[a] breach of fiduciary duty claim is barred by the gist of the action doctrine if the fiduciary duty alleged is grounded in contractual obligations." *Alpart v. Gen. Land Partners, Inc.*, 574 F. Supp. 2d 491, 499 (E.D. Pa. 2008). Thus, the source of the duty controls the analysis. The source of the Hedeker Wealth Defendants' fiduciary duty to Mr. Giordano arises from the Wrap Fee Agreement, and Mr. Giordano has not argued to the contrary. Because this duty is grounded in contractual obligations, the gist of the action doctrine precludes Mr. Giordano from asserting a parallel breach of fiduciary duty claim. Thus, the Hedeker Wealth Defendants are entitled to summary judgment on Count Two of the Amended Complaint.

**ii. Breach of contract**

Mr. Giordano can proceed with his breach of contract claim against the Hedeker Wealth Defendants based on their post-revocation instructions to EQUUS to send distributions to Ms. Moukarzel's personal account.[13] The Wrap Fee Agreement

---

13 Mr. Giordano has not asserted a breach of contract claim against the Hedeker Wealth Defendants based on the diversion of Dillon distributions to Ms. Moukarzel's account. Instead, he alleges that "Defendant Hedeker breached [the Wrap Fee Agreement] by representing to Equus after November 29, 2021 that he possessed the authority to request that the income from the couple's joint investment account be redirected to Ms. Moukarzel's personal account." (ECF No. 19 at ¶ 91.)

authorized Hedeker Wealth to rely on and act upon instructions from either Mr. Giordano or Ms. Moukarzel with respect to their property "unless and until such reliance is revoked in writing …." (ECF No. 44-21 at ¶ 17.) Thus, once Mr. Giordano revoked the Hedeker Wealth Defendants' authority to act on his behalf, Mr. Hedeker could not take any action affecting Mr. Giordano's property without his consent. Though the Hedeker Wealth Defendants argue that their post-revocation communications to EQUUS were meant to clarify valid, pre-revocation instructions from Ms. Moukarzel, that is an argument they may make to a jury. Indeed, a reasonable jury could conclude that the subsequent directive to EQUUS was in breach of the Wrap Fee Agreement. Thus, they are not entitled to summary judgment on Count Three.

**iii. Fraud**

Mr. Hedeker is entitled to summary judgment on Mr. Giordano's fraud claim based on Mr. Hedeker's alleged misrepresentations to EQUUS because Mr. Giordano has abandoned that claim.[14] In Count Four of his Amended Complaint, Mr. Giordano alleges that Mr. Hedeker was liable for fraud because he "fraudulently represented to Equus that he possessed the necessary authority to request that the income from the couple's joint investment account be redirected into Ms. Moukarzel's personal account." (ECF No. 19 at ¶ 96.) Mr. Hedeker moved for summary judgment on this claim, arguing that "there is

[14] Like the breach of contract claim, Mr. Giordano did not assert a fraud claim against Mr. Hedeker based on the Dillon diversions. (*See* ECF No. 19 at ¶¶ 94-98.)

no evidence or contention that [Mr.] Giordano relied on that representation … to his detriment." (ECF No. 44-1 at 16.) In his opposition, Mr. Giordano fails to address this argument.

Where "a party opposing summary judgment responds to a summary judgment motion 'but fails to address the substance of any challenge to particular claims, that failure constitutes an abandonment of th[o]se causes of action and essentially acts as a waiver of these issues.'" *Reeves v. Travelers Companies*, 296 F. Supp. 3d 687, 692 (E.D. Pa. 2017) (quotation omitted).[15] Mr. Giordano did not respond to the Hedeker Wealth Defendants' arguments about the fraud claim that Mr. Giordano asserts in his Amended Complaint. Thus, he has abandoned the fraud claim, and Mr. Hedeker is entitled to summary judgment as to Count Four of the Amended Complaint.

Rather than respond to those arguments, Mr. Giordano tries to move the goal posts, arguing that he can survive summary judgment based on a series of fraud claims that he did not assert in his Amended Complaint. By way of one example only, Mr. Giordano now contends that Hedeker Wealth is liable for fraud due to Mr. Sullivan's misrepresentation to Mr. Giordano that he would receive Palantir shares from LYM 5. This theory of liability does not appear in Count Four of his Amended Complaint, which

---

[15] *See also Markert v. PNC Fin. Servs. Grp., Inc.*, 828 F. Supp. 2d 765, 773 (E.D. Pa. 2011) ("Where an issue of fact or law is raised in an opening brief, but it is uncontested in the opposition brief, the issue is considered waived or abandoned by the non-movant in regard to the uncontested issue.").

he asserted against Mr. Hedeker only. It goes without saying that Mr. Giordano cannot amend his Amended Complaint via his response in opposition to summary judgment. And even if such amendment were possible, those claims would fail because Mr. Giordano cannot prove that he suffered damages. Like his other theories of liability, his claims for damages based on a lost opportunity to invest in Palantir are speculative. At best, he testified that he would have invested $500,000 of Ms. Moukarzel's money or his own. (*See* ECF No. 44-8 at 54:13-15.) But, of course, he cannot speak to whether Ms. Moukarzel would have agreed to this plan, and there is no way to know how much Palantir Mr. Giordano would have purchased with his own money.

## III. HEDEKER WEALTH DEFENDANTS' MOTION TO PRECLUDE

### A. Legal Standard

A district court has wide discretion in determining whether to admit expert testimony. *See Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). Federal Rule of Evidence 702 provides that a qualified expert may testify in the form of an opinion if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "Rule 702 embodies a trilogy of restrictions on expert testimony:

qualification, reliability and fit." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citation omitted).

### B. Analysis

To "fit" the case, expert testimony "must be relevant … **and** must assist the trier of fact." *Id.* (emphasis added.) There must be a valid "connection to the pertinent inquiry as a precondition to admissibility." *Id.* (quotation omitted). I will preclude Mr. Kronvall from testifying at trial because his opinions no longer "fit" the case, given my rulings on summary judgment.

The only claim that Mr. Giordano can present to a jury is his breach of contract claim against the Hedeker Wealth Defendants based upon their alleged diversion of EQUUS distributions from a joint account to Ms. Moukarzel's personal account. In addition, the only quantifiable damages he has are the costs associated with having to seek relief from the divorce court to have the funds put back into the joint account. As a result, Mr. Kronvall's expert report no longer fits the case for two reasons.

*First*, Mr. Kronvall rendered an opinion as to whether the Hedeker Wealth Defendants breached a fiduciary duty to Mr. Giordano. But as set forth above, the gist of the action claim bars Mr. Giordano's fiduciary duty claim, which is grounded in the Wrap Fee Agreement. Thus, the question is whether the Hedeker Wealth Defendants breached the Wrap Fee Agreement, not whether they breached fiduciary duties.

*Second*, the only damages related to EQUUS that Mr. Giordano can establish without speculation are the costs he spent litigating a motion in the divorce proceedings to retrieve the diverted funds. But Mr. Kronvall did not opine as to those amounts. Thus, his testimony is irrelevant to the remaining issues in this case and would not assist the jury. Because his testimony does not fit what is left in this case, I will exclude it.

## IV. CONCLUSION

Mr. Giordano can present his breach of contract claim based on the EQUUS diversions to a jury. But the rest of his claims against Mr. Hedeker, Hedeker Wealth, and Hedeker Law fail, and Defendants are entitled to summary judgment on those claims. Given the narrowed scope of this case, Mr. Kronvall's expert opinion no longer fits the remaining issues, and the Hedeker Law Defendants' motion to preclude Mr. Cohn as an expert is moot. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

September 28, 2026